UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

  v.        CASE NO. 5:20-cr-59-JA-PRL

DAVID CHAPPELL FEY
SHARI LYNN GUNTER

## GOVERNMENT'S TRIAL MEMORANDUM

  THE UNITED STATES OF AMERICA, by and through its attorney, Karin Hoppmann, Acting United States Attorney for the Middle District of Florida, and Michael P. Felicetta and Tyrie K. Boyer, Assistant United States Attorneys for the Middle District of Florida, of counsel, hereby submits its trial memorandum of law in this matter.

## I. SUPERSEDING INDICTMENT

  The Superseding Indictment charges defendant David Chappell Fey (FEY) and Shari Lynn Gunter (GUNTER) as accomplices in four counts. Count One charges them with Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. This offense relates to the sale of methamphetamine to K.B. on January 19, 2016, while she was acting as an informant for the government. It will be alleged in this trial that FEY and GUNTER became aware of this cooperation and conspired to murder K.B. in retaliation and to prevent her from being a witness against them.

Count Two charges them with Conspiracy to Murder a Witness, in violation of 18 U.S.C. §§ 1512(k), (a)(1)(C), (a)(3)(A), and 1111. This count alleges that the defendants conspired with each other and with others to kill K.B. to prevent her from being a witness against them and relaying their drug dealing activities to federal law enforcement officers and federal courts. The object of the conspiracy was murder in the first degree.

Count Three charges them with Murder of a Witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C), (a)(3)(A), 1111 and 2. This count alleges that the defendants did kill K.B. to prevent her from being a witness against them and relaying their drug dealing activities to federal law enforcement officers and federal courts. The killing is alleged to constitute murder in the first degree.

Count Four charges them with Conspiracy to Distribute a Controlled Substance Causing Death, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). This count alleges that the defendants conspired with each other and with others to distribute methamphetamine and fentanyl, and that K.B. died as a result of the distribution.

## II. THE INVESTIGATION

### INITIAL DRUG AND GUN INVESTIGATION

Local, state, and federal law enforcement officers have been actively investigating two violent street gangs in Marion County for several years. One of

those gangs is nationally organized and known as the Outlaws Motorcycle Club (OMC). The Ocala chapter of OMC is known to engage in the trafficking of narcotics and firearms, as well as other violent crimes. The other gang being targeted is local to Marion County and known as the Crazy White Boys (CWB). This organization is made up of both male and female white supremacists, who also engage in the trafficking of narcotics and firearms, as well as other violent crimes.

In early 2016, detectives within the Marion County Sheriff's Office (MCSO) Tactical Investigations Unit (TIU) were investigating OMC and CWB. MCSO-TIU was created in 2013 to work undercover to dismantle and break-up criminal enterprises. They became aware that FEY was distributing methamphetamine, heroin, and other drugs, to members of OMC and CWB.

Meanwhile, in January 2016, agents within the Florida Department of Law Enforcement (FDLE) had opened a joint investigation with agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). FDLE and ATF were primarily concerned with the transfer and sale of illegal firearms by OMC. Those agents coordinated with MCSO-TIU, in their shared efforts to investigate these criminal organizations.

**ACTIVATION OF K.B. AS INFORMANT**

On January 11, 2016, K.B. was arrested by MCSO after a traffic stop that

was approximately 1.5 miles from FEY's residence. Former Deputy Daniel Barker found K.B. to be in possession of methamphetamine and unused syringes, which she admitted to using for the purpose of injecting methamphetamine. K.B. informed Deputy Barker that she just purchased the methamphetamine from FEY, who she referred to as "Dave" and "Santa Claus." As a result of her willingness to cooperate further, K.B. was not arrested and instead referred to MCSO-TIU.

On January 13, 2016, K.B. and her attorney met with an Assistant State Attorney and two detectives from MCSO-TIU, Detective Mitchell Tucker and Detective Travis O'Cull. K.B. explained that she was trying to get clean from drugs after years of struggling with addiction and spousal abuse. She was single and had her own residence, a small cottage in Oxford, Florida, where she was renovating in hopes of regaining custody of her three children. Images of her residence (taken in 2021) have been marked as Government Exhibits 67 and 68. K.B. stated that she would be willing to cooperate against FEY and GUNTER in exchange for consideration on her case. When asked why she wanted to avoid charges, K.B. stated "to keep my kids." Images of K.B. and her children have been marked as Government Exhibits 69 and 70.

K.B. was officially activated as an informant for the MCSO-TIU. She was assigned moniker "CI-16A" and her assigned handler was Detective Tucker. K.B.

informed Det. Tucker that she was able to purchase drugs from FEY and GUNTER, who lived together at a residence in Summerfield that FEY inherited from his deceased mother. Images of FEY's residence (taken in 2020) have been marked as Government Exhibits 21A-D and 22.

**CONTROLLED BUY FROM FEY & GUNTER (COUNT ONE)**

On January 19, 2016, a controlled buy was conducted inside FEY's residence by K.B. Det. Tucker recorded a controlled telephone call between FEY and K.B. prior to the transaction wherein FEY agreed to sell her methamphetamine. However, that call was not preserved and the government does not have a copy. Documents reflect that FEY agreed to sell K.B. a small amount of methamphetamine in exchange for $40.

When K.B. arrived at the residence, FEY and GUNTER were both present inside. A video and audio recording device captured conversations between the parties during the transaction. A copy of this recording has been marked as Government Exhibit 53. During the controlled purchase, K.B. handed FEY the currency and GUNTER was directed by FEY to provide the methamphetamine to K.B. GUNTER did as instructed and K.B. later turned that item over to Detective O'Cull. The item, marked as Government Exhibit 57, was later analyzed by the FDLE laboratory and found to contain methamphetamine.

One week after the controlled buy, on January 26, 2016, there was another

recorded telephone conversation between K.B. and FEY. The call was preserved and is marked as Government Exhibit 54.

On January 28, 2016, K.B. met with Det. Tucker and identified FEY and GUNTER from photographs presented to her. Those have been marked as Government Exhibit 55.

## DEACTIVATION OF K.B. AND FILING OF ARREST WARRANT

On February 22, 2016, K.B. was deactivated as an informant for having inappropriate conversations with her handler, Det. Tucker. Det. Tucker informed his chain of command that K.B. was making suggestive text messages and calls to him. K.B. also failed to get her driver's license reinstated, which impacted the ability to use her as an informant. The deactivation was memorialized in an email to the State Attorney's Office by Sgt. Liberatore (Government Exhibit 106, pg. 15).

On February 24, 2016, Det. Tucker requested that MCSO Dep. Barker apply for a warrant for K.B. for the initial traffic stop on January 11, 2016. A copy of the warrant and arrest affidavit is marked as Government Exhibit 45. In the affidavit, which was filed in public records, it reveals the statements made by K.B. on January 11, 2016, which implicate FEY.

On February 29, 2016, K.B. was arrested in Sumter County for the charge related to the traffic stop on January 11, 2016. A copy of the warrant and arrest

report is marked as Government Exhibit 46.

## ATTEMPTED ACTIVATION OF K.B. BY ATF

As noted above, ATF was already investigating OMC in early 2016. On January 26, 2016, a criminal file was opened at the U.S. Attorney's Office in the name FEY based on the federal investigation pending with ATF SA Dewane Krueger.

After K.B. was deactivated by MCSO-TIU, SA Jeffrey Vash (FDLE) and SA Krueger approached K.B. to work with her as an informant. Although they never signed K.B. up as an informant, they did conduct an interview with her on March 7, 2016, and documented intelligence on FEY and his associates. Those have been marked as Government Exhibits 25 and 31.

On April 6, 2016, K.B. was found dead inside her vehicle at a cemetery in Oxford, Sumter County, Florida. The cemetery is located less than 1/4 mile from K.B.'s home. Detectives at the Sumter County Sheriff's Office (SCSO) initially handled the investigation into K.B.'s death.

## SCSO INVESTIGATION INTO HOMICIDE

Although not known at the time. K.B. was murdered at FEY's residence in Marion County and her body was driven to the cemetery in Sumter County and positioned in her vehicle to look like an accidental overdose scene. Despite signs of foul play at the scene, SCSO detectives were unable to establish that a

7

homicide occurred, and their case was closed as an "accidental overdose" on June 3, 2016.

On the morning of April 6, 2016, at approximately 8:00am, Kyle Konrath reported for work at a nearby farm when he noticed K.B.'s Ford Mustang parked at the cemetery entrance. At approximately 9:15am, he noticed K.B. seated in the driver's seat and assumed she fell asleep. He informed his employer, James Jackson.

At approximately 2:30pm, Jackson attempted to wake K.B. by blowing on his horn. When he saw no response, he called 911 to report a non-responsive woman in her car parked on the property. SCSO Deputy Dodge arrived and quickly ascertained that K.B. was deceased in her locked vehicle. The scene was secured while deputies awaited detectives and an investigator from the Medical Examiner's (M.E.) Office to arrive.

The scene was photographed and documented by both the SCSO and the M.E.'s Office. The condition of K.B.'s body revealed that she had died hours earlier as rigor mortis had set in and lividity was present in her lower extremities. Her clothing appeared disheveled and unusual. On the center console area, SCSO recovered two used hypodermic needles, both of which field-tested positive for methamphetamine. Inside her purse, they recovered two additional needles of the same kind and color.

The passenger door was latched and locked but it was not closed all of the way. Whoever closed the door, failed to recognize that the seatbelt was blocking the door from closing properly (see Government Exhibit 1(O)). Her purse and wallet were undisturbed, but K.B.'s cellphone was missing. Records would later reveal that she was using her phone to make and receive calls and text messages until approximately 12:38am on April 6, 2016. After that point, all incoming calls were routed immediately to her voicemail. (Government Exhibit 15 and 16).

K.B.'s mother, who was worried about not hearing from her daughter, had been calling K.B.'s cellphone since 6:00am with no response. K.B.'s mother told SCSO detectives that there were several unusual facts surrounding K.B.'s death. First, K.B. was an experienced drug user, and she would not have taken more than she could handle. Second, K.B. has never been unreachable by cellphone, and she had the same cellphone number for several years. Third, K.B. was terrified of the dark and she would never have used drugs alone in her vehicle in the nighttime at a cemetery, particularly when her home (where she lived alone) was only two minutes away.

Det. Glim was assigned this case and spoke with witnesses who knew K.B. and who saw her the night of her death. Det. Glim learned that K.B. was last seen at her residence at around 11:00 pm by her neighbors, Travis and Shelley Varnum. Thereafter, K.B. was seen with FEY around 11:30 pm by Charles

Browning, the roommate of Protected Witness 1 (PW1). PW1 is a common friend of both FEY and K.B., and she was present at FEY's residence the evening of K.B.'s death.

PW1 told Det. Glim that FEY and GUNTER were extremely high on meth the night of K.B.'s death. They were angry that someone had stolen money and drugs from FEY's residence, and they accused PW1. They were also angry with K.B. and referred to her as a "snitch." PW1 stated that FEY and GUNTER were talking about "getting her" with a "hot shot" or possibly a baseball bat that evening. PW1 wasn't sure if they were talking about PW1 or K.B. so she left FEY's residence on foot and walked home, which is 7 miles away.

While PW1 was walking home, FEY and K.B. were observed by Charles Browning at his residence. Browning never met FEY or K.B. before, and invited them inside his home. FEY concerned him, as he was expressing his frustration that someone stole from him and how he needed to speak with PW1. K.B. gave Browning her cell phone number and told him to call her once PW1 arrived home.

PW1 arrived home around 11:30 pm and was told by Browning: "FEY and K.B. were just here, looking for you." PW1 then used Browning's cell phone to call K.B.'s cell phone, which is reflected in the phone record as occurring at 11:26 pm.

On June 3, 2016, the M.E. ruled the death an accidental overdose and Det. Glim closed his case. The M.E. was unaware of the witness reports detailing a possible "hot shot" by FEY. The M.E. was given the relevant evidence uncovered in this case and on October 21, 2020, she amended her autopsy findings to reflect that the manner of death was homicide.

**THE FDLE/ATF INVESTIGATION**

In August 2016, agents were informed that FEY was incarcerated at the Marion County Jail (MCJ) on drug charges. FEY was arrested on January 21, 2016, for possession of heroin and oxycodone by MCSO. On July 11, 2016, he was sentenced to 150 days in the MCJ.

On August 15, 2016, SA Vash met with PW2, an inmate housed in the same medical unit with FEY. The interview has been saved as Government Exhibit 35(A). PW2 revealed that FEY made multiple admissions about killing a girl with a "hot shot" because she was an informant against him. PW2 agreed to cooperate and wear a recording device for law enforcement.

SA Vash also learned that one of FEY's closest associates, PW3 had recently been arrested with GUNTER and wanted to proffer. On August 18, 2016, PW3 gave a lengthy recorded statement implicating FEY and GUNTER in numerous crimes, including the murder of K.B. PW3 reports that FEY made admissions to him about them giving K.B. a "hot shot," which he understood to

be a very potent injection of drugs. The interview has been saved as Government Exhibit 36(A).

SA Vash determined that on August 8, 2016, FEY made a recorded video call from MCJ to his close friend and subordinate, Mark Mudloff. The recording has been marked as Government Exhibit 34(A). In that call Mudloff told FEY something was fishy because Mudloff couldn't get ahold of law enforcement or FEY's attorney regarding his drug charges. FEY told Mudloff to contact SCSO and inquire about "that girl who died" and see if it was related to that.

On September 21, 2016, PW2 agreed to wear a recording device and discuss the homicide with FEY, all of which was captured on video and audio recordings (Government Exhibits 39 and 40). FEY made several incriminating statements during the meeting with PW2, explaining how he and GUNTER killed K.B. He explained that a "hot shot" is a syringe containing a large amount of methamphetamine and fentanyl. FEY states that the victim would never even know what she was taking, and that after she died, you move her body and stage the scene to look like an accidental overdose. He also admitted that K.B. was an informant and bragged that "you don't snitch… and especially on me."

On November 10, 2016, agents conducted a custodial interview of GUNTER at MCJ (Government Exhibit 43). GUNTER was advised of her Constitutional rights and agreed to the interview. In the interview, GUNTER

initially claimed that she never saw K.B. on the day of her death but later admits

that she did. GUNTER claims that she had been hiding from police at FEY's

residence that day. Although she denies any involvement in K.B.'s death, she

acknowledges that K.B. was at FEY's residence on the night of her death.

GUNTER also places David Greene, PW1 and PW8 at the residence.[1]

GUNTER also admits in her interview that she knew K.B. was a "snitch"

who was working with the police, and that K.B. had confided as much to FEY.

GUNTER further admits that K.B. cooperated because of drugs that K.B. had

been caught with, which GUNTER admitted providing to K.B. She states that the

last time K.B. was alive, K.B. was with FEY and David Greene, but she falsely

denies being with them.

## UDEST / DEA INVESTIGATION

On March 29, 2018, agents with the Drug Enforcement Administration

(DEA) in Gainesville conducted a proffer interview with PW4, a drug defendant

being prosecuted by the government. PW4 provided historical information about

FEY's drug trafficking activities, and admitted that prior to his arrest in 2017, he

was the person who sourced FEY's methamphetamine. He would later inform a

---

[1] PW8 will be described later in this brief as the only surviving eyewitness to this murder. David Greene has been identified as the third person who killed K.B. together with FEY and GUNTER. Greene died of a suspicious overdose of methamphetamine and fentanyl on 12/03/2018. The investigation into his death continues.

grand jury in Ocala that FEY and GUNTER made admissions to him about the overdose death of a woman. Although they did not specify who the victim was, FEY and GUNTER reportedly told PW4 that she died from drugs that they (FEY and GUNTER) gave her.

In May 2019, MCSO detectives assigned to the Unified Drug Enforcement Strike Team (UDEST) conducted four controlled buys for methamphetamine from FEY. One of those detectives (MCSO Det. Jason Webb) was also working as a Task Force Officer for the DEA. TFO Webb conducted a fifth controlled buy on October 1, 2019, in his capacity as a DEA officer. The same cooperating source was used for all five of those controlled buys.

Unbeknown to those agents, detectives in the Clay County Sherriff's Office (CCSO) has used an informant to conduct a controlled buy from FEY on October 1, 2019. Thereafter, on October 17, 2019, CCSO utilized their informant to purchase four ounces of methamphetamine from FEY. When FEY showed up in Clay County with the drugs, law enforcement stopped his car and found the methamphetamine. That arrest on October 17, 2019, led to a one-count indictment under this case (5:20-cr-59-JA-PRL) on August 19, 2020. Once FEY was in custody and detained on this federal indictment, witnesses became less fearful of cooperating and TFO Webb was able to identify and interview the only living eyewitness to the murder, PW8.

On July 18, 2020, PW5 reported that her ex-boyfriend, FEY, stole property from her. When MCSO deputies responded to her home, she also told them that FEY confessed to being involved with the murder of K.B. On July 24, 2020, a MCSO detective interviewed PW5 about those admissions and maintained a recording of that interview (Government Exhibit 94). PW5 states that she left for Texas on July 15, 2020, and that FEY made these admissions to her just before that date.

On September 24, 2020, TFO Webb learned that GUNTER was arrested by MCSO on burglary charges and requested to speak with a DEA agent. After advising her of her Constitutional rights, GUNTER spoke with TFO Webb about several drug dealers. Towards the end of her interview, TFO Webb asked her whether she was holding back information on FEY. GUNTER asked TFO Webb what he wanted to discuss, and TFO Webb would not say. After several moments of quiet, GUNTER stated "Oh, you're talking about the [K.B.] thing?"

GUNTER then told TFO Webb that she read the arrest report from K.B.'s traffic stop on January 11, 2016. GUNTER reportedly pulled the report from the court's website and claimed that it revealed K.B. was cooperating against FEY. GUNTER further acknowledged the presence of her, FEY, David Greene, PW1 and PW8 at the residence on the night of K.B.'s death. GUNTER states that someone stole all of their drugs, so they couldn't have made a "hot shot" but then

claims that PW8 brought more drugs to the home that night. GUNTER denied any involvement by her or FEY in the death of K.B. A report detailing her interview has been marked as Government Exhibit 103. No recording was made.

On October 5, 2020, TFO Webb met with PW6 at the MCJ. PW6 was in custody on federal charges related to his violation of supervised release. PW6 stated that he wanted to meet with agents to assist in the death investigation of K.B. Initially, PW6 had planned to proffer that FEY was not involved in the death. PW6 decided not to proffer that information, and instead admitted that FEY solicited him in the jail to provide false exculpatory testimony to federal agents. Instead, PW6 told agents what he truly knows about the death of K.B. A report detailing his interview has been marked as Government Exhibit 77.

PW6 has known FEY and GUNTER for many years and purchased methamphetamine from them. In the summer of 2017, when FEY was serving his local jail sentence of 150 days, FEY paid PW6 in methamphetamine to watch his belongings. During that time period, he and his wife (PW7) were with GUNTER at FEY's house using drugs. GUNTER was preparing their syringe with methamphetamine, which she had done on numerous occasions before. During a playful argument with her, GUNTER told PW6 and PW7, "You should be careful what you say to the person that mixes up your dope, I've already had to give somebody a hot shot." GUNTER explained that she previously killed a girl

who lived in a "camper" by giving her a "hot shot." (K.B.'s home was described by those who knew her as a cottage, and GUNTER owned a camper that was located on the same property as K.B.).

PW6 further states that in the days leading up to his proffer on October 5, 2020, FEY made several admissions to him about the circumstances surrounding K.B.'s death. FEY admitted that GUNTER made up the first shot that caused K.B. to be incapacitated. GUNTER then called FEY on the telephone and stated, "It's done." When FEY returned to the home, K.B. was already in the Mustang and had awoken from the first shot. K.B. reportedly looked scared and FEY watched as GUNTER and David Greene administered a second shot to K.B. that killed her. Greene then drove K.B.'s Mustang to the cemetery to stage the scene, and FEY followed in his own vehicle to assist. However, FEY did not want PW6 to tell police that he assisted with the staging of K.B.'s body. Instead, he wanted PW6 to assist in shifting all blame to GUNTER, so that FEY could "bury her."

FEY also told PW6 that GUNTER kicked K.B. in the head when she was unconscious. The M.E. documented injuries to K.B.'s left upper head, consistent with recent trauma to that area just before her death. FEY stated that PW8 was an eyewitness to the murder, but that he wasn't concerned about her talking to the police. Following the proffer, agents interviewed PW6's paramour, who corroborated the incident and the statements made by GUNTER (Government

Exhibit 82).

The day after learning of PW8's identity for the first time, agents set out to locate her. On October 6, 2020, TFO Webb and other agents located PW8 at her home. When they arrived, she immediately told them that she knew they were there to discuss K.B.'s death. She further stated that she knew that this day would come but she never came forward out of fear of FEY and GUNTER. After being told both were in custody, PW8 fully cooperated and has since testified before the Grand Jury on this case (see Government Exhibits 63 and 64).

PW8 was present when the murder took place. She will testify that FEY and GUNTER were upset because someone (believed to be PW1) stole drugs and money from the house that day. They were also upset with K.B., because of her cooperation with the police against them. PW8 states that when K.B. arrived at the residence, GUNTER hid in the bedroom while K.B. sat with FEY. David Greene was also present at that time. FEY and Greene went into the bedroom while K.B. sat on the couch and spoke with PW8. Then, FEY came out and told K.B. that he left something for her in the bathroom. FEY then departed with Greene. K.B. went into the bathroom and moments later, PW8 heard her body crash to the floor. GUNTER came out from hiding and forced her way into the bathroom, where K.B. was unconscious. GUNTER had a difficult time due to the

door being blocked by K.B.'s body. Eventually, GUNTER is able to drag K.B.'s body to the floor in the living room, where she proceeds to kick K.B. in the head.

PW8 believed that K.B. was intentionally drugged by FEY and GUNTER. She previously heard FEY discussing that K.B. was an informant, and that K.B. placed a listening device at his property for the police. FEY returned to the home within 10 minutes, and FEY, GUNTER, and Greene immediately went to work to remove K.B. from the residence and move her body to the Mustang's passenger seat. They each retrieved latex gloves from the sink cabinet, to prevent their fingerprints or DNA from being left on her body or her car. They were also observed wiping down the vehicle with a cleaning solution.

PW8 then states that FEY, GUNTER, and Greene departed the home with K.B.'s car and a second vehicle following. After approximately 20 minutes, they returned back to the residence in both cars. Greene came in the home and stated that K.B. "woke up" and he proceeded to obtain a second "hot shot." Then, all three of them (FEY, GUNTER, and Greene) were positioned at the passenger side of the Mustang where K.B. was seated. PW8 believes that one of them then administered the shot to K.B., and they again left in the same manner as previously.

PW8 was picked up by her daughter minutes later and did not see any of these individuals again that night. PW8's daughter would later corroborate what PW8 told her about K.B. when she picked up PW8 (see Government Exhibit 71).

On June 17, 2021, PW9 (an inmate at the MCJ) contacted MCSO to inform them that FEY was attempting to solicit him to murder PW8. According to PW9, FEY states that PW8 was the "key witness" at his trial and that all of his legal problems would go away if he could kill PW8. FEY described the home where PW8 lives with her husband and asked PW9 to burn it down with them inside. In exchange, FEY offered PW9 a Harley Davidson Night Train motorcycle that FEY owned.

PW9 further states that approximately one year prior, he was present at the home of PW8 when FEY showed up. It was at that time that FEY told PW9 about the murder of "a girl." FEY told PW9 that GUNTER prepared a "hot shot" and gave it to the girl. FEY stated that the first shot didn't work, so FEY then mixed up a second shot, and administered it to the victim. FEY then stated, "If you wanna do something right, you gotta do it yourself." FEY also told PW9 that they kicked and chocked the victim.

PW9 further claimed that FEY and/or GUNTER gave him a "hot shot" six or seven years ago. He was at a house with FEY and GUNTER and gave himself a shot of what he believed to be his normal dose of methamphetamine.

PW9 immediately suffered paralysis and fell to the floor. As this was happening, PW9 heard FEY and GUNTER laughing, and overheard someone say, "look he's going out." PW9 was later told by a third party that FEY gave him the "hot shot" because he was angry with PW9 for making sexual advances towards GUNTER. The report detailing the interview of PW9 is marked as Government Exhibit 84. Images from the MCJ depicting a conversation between FEY and PW9 on June 12, 2021, are marked as Government Exhibits 87 and 88.

In addition to the statements of PW9 concerning PW8, there is also a recorded conversation made by FEY which was intercepted from the MCJ on July 18, 2016. FEY was speaking with his subordinate, Mudloff, and giving instructions on how to handle his drugs and firearms while he was incarcerated. At marker 7:34 of Government Exhibit 37(A), Mudloff tells FEY that PW8 is in jail. Records confirm that PW8 was arrested on July 16, 2016 (Government Exhibit 65). This corroborates that FEY is well aware of PW8 in 2016, just three months after the homicide.

## III. POTENTIAL TRIAL ISSUES

At trial, the government expects that various evidentiary issues may arise. Some of these issues are delineated below

### A. Statements and Acts in Furtherance of the Charged Conspiracy

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not

hearsay if made by a coconspirator of the defendant during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). To offer a coconspirator statement pursuant to Rule 801(d)(2)(E), the United States must establish by a preponderance of the evidence that: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) the statement to be introduced was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. 171 (1987); *United States v. Dickerson*, 238 F.3d 1036, 1049 (11th Cir. 2001).

In determining if a conspiracy existed, the court may consider the coconspirator's statement sought to be admitted as well as other independent evidence. *Bourjaily*, 483 U.S. at 180-81; *United States v. Chestang*, 849 F.2d 528, 531 (11th Cir. 1988). The Court need not make a pretrial determination that the statements are admissible, *see United States v. James*, 590 F.2d 575 (5th Cir. 1979); rather, the Government may assure the court that the statements are connected to a conspiracy and the Court may rule at the close of the Government's case whether the statements are admissible, *see United States v. Hasner*, 340 F.3d 1261, 1275 (11th Cir. 1975).

Statements serving a necessary part of a conspiracy – for example, by concealing it or impeding an investigation – are admissible as coconspirator statements. *See United States v. Blakey*, 960 F.2d 996, 998 (11th Cir. 1992) (citing

*United States v. Griggs*, 735 F.2d 1318, 1325 (11th Cir. 1984)). Moreover, a conspiracy for admitting a coconspirator statement need not be the same one for which the defendant is charged. *United States v. Bowe*, 221 F.3d 1183, 1193-94 (11th Cir. 2000).

The Eleventh Circuit applies "a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *United States v. Dickerson*, 248 F.3d 1036, 1050 (11th Cir. 2001) (*quoting United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir.1988)), *cert. denied*, 536 U.S. 957 (2002). This requirement is satisfied if the statement is "designed to promote or facilitate the achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). While "[m]ere idle chatter" does not qualify under this standard, the "in furtherance" criteria is satisfied by a wide variety of statements designed to promote the conspiracy, including statements which "provid[e] reassurance to a coconspirator, seek[] to induce a coconspirator's assistance, serv[e] to foster trust and cohesiveness, . . . inform[] coconspirators as to the progress or status of the conspiracy, or . . . prompt[] the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993); *see also United States v. Johnson*, 450 Fed. Appx. 878 (11th Cir. 2012) (affirming admission of coconspirator statements in drug and firearm case when post-arrest jailhouse calls and other recorded conversations

showed an attempt to influence trial witness testimony); *see also United States v. Handy*, 668 F.2d 407, 408 (8th Cir. 1982) (statement of one coconspirator identifying another is in furtherance of a conspiracy).

Here, the United States will offer evidence that FEY and GUNTER were involved in a conspiracy to distribute fentanyl and methamphetamine and to murder K.B. because of her cooperation with law enforcement. FEY has attempted to use PW6 to provide false exculpatory evidence to the government in a proffer setting. He has also attempted to hire PW9 as a hitman to kill a witness in this case. The statements FEY made to those witnesses are admissible against FEY and GUNTER because they were made to conceal their crimes or impeding the investigation.

### B.   Statements Against Penal Interest and the Confrontation Clause

Even if some of the defendants' statements are not admissible under Fed. R. Evid. 801(d)(2)(E) as coconspirator statements, they are otherwise admissible as statements against penal interest, pursuant to Fed. R. Evid. 804(b)(3). For that reason, the government submits that neither jury should be excused from hearing testimony by civilian witnesses who heard incriminating statements from one defendant or the other, except as outlined below.

The government has already agreed that certain statements made by the defendants are inadmissible against the other defendant because they constitute a

violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620 (1968). See Doc. 143. These statements were made to law enforcement (or an agent of law enforcement) and therefore are testimonial statements triggering the Confrontation Clause. Statements against interest to private individuals generally do not violate the Confrontation Clause because they must be "genuinely self-inculpatory" and this "is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." *Williamson v. United States*, 512 U.S. 594, 605 (1994) (citation omitted); see also *United States v. Klemis*, 859 F.3d 436, 444 (7th Cir. 2017); *United States v. Dargan*, 738 F.3d 643, 650-651 (4th Cir. 2013); *United States v. Manfre*, 368 F.3d 832, 841-842 (8th Cir. 2004).

The government agrees that the entirety of testimony from PW2 should only be introduced before FEY's jury. The reason why this testimony is inadmissible against GUNTER is because PW2 was an agent for law enforcement, wearing a wire, when he obtained the incriminating statements from FEY. Therefore, this testimony would constitute testimonial statements triggering the Confrontation Clause.

With respect to retired SA Jeff Vash, the government submits that his testimony should be broken down into three parts: (1) testimony regarding his investigation which is admissible before both juries; (2) testimony regarding the

operation involving PW2, which should only be admissible against FEY; and (3) the recorded interview of GUNTER, which should only be admissible against GUNTER. The government will prepare Mr. Vash to provide his testimony in that order, which follows a chronological timeline of events (his investigation culminated with the operation using PW2 on September 21, 2016, and the subsequent interview of GUNTER on November 10, 2016).

The only other testimony that would require excusing one of the juries is that of TFO Jason Webb, our case agent. TFO Webb will testify before both juries to explain the investigation he conducted in this case. But he will also testify as to statements made to him by GUNTER in an interview on September 24, 2020. These statements are testimonial and therefore not admissible before FEY's jury. At the end of TFO Webb's testimony, we will request that the FEY jury be excused so that the GUNTER jury can hear testimony regarding her statements to TFO Webb. It is also possible, for the reasons explained in Document 79, that FEY's proffer protected statements will be admissible at the trial. This would occur if FEY opens the door to the admission of these statements. In that scenario, we would seek the GUNTER jury to be excused while TFO Webb provides testimony to the FEY jury regarding the proffer statements of FEY.

With respect to all other witnesses in this case, the government submits

that neither jury should be excused because the admissions of FEY or GUNTER are admissible against both, pursuant to Fed. R. Evid. 801(d)(2)(E) (coconspirator statements) or Fed. R. Evid. 804(b)(3) (statements against interest).

A non-testimonial hearsay statement of a third party (including a co-defendant) that inculpates the declarant may be admissible against the accused if "(1) the declarant is unavailable;[2] (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement is corroborated by circumstances clearly indicating its trustworthiness." *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1208 (11th Cir. 2009) (quoting *United States v. Costa*, 31 F.3d 1073, 1077 (11th Cir.1994)); Fed. R. Evid. 804(b)(3). This exception to the rule against hearsay is known as a statement against interest. *Id*.

In *United States v. Westry*, 524 F.3d 1198, 1214-1216 (11th Cir. 2008), the District Court admitted statements from a deceased victim implicating himself and the defendant. A witness testified that he had heard the victim say that the defendant was coming over to bring the victim some drugs prior to his death (the victim died as a result of the drugs that were distributed by the defendant). *Id*. In affirming the conviction, the court ruled that these statements met the three

---

[2] In this case, the declarants are the defendants. As such, they are unavailable and this element is not further discussed here. *United States v. Burke*, 495 F.2d 1226, 1232 (5th Cir. 1974)

requirements of statements against interest. *Id.* As to the second element
(requiring the statement to be inculpatory), the court noted that "it is unnecessary
that the declarant know he was speaking to a person who could cause his
prosecution." *Id.* While the relationship between the declarant and the witness
appears to be a more significant consideration for the third element, *see* 2
McCormick On Evidence § 319 (8th ed.) (listing cases and noting "A relationship
of confidence and trust is generally viewed as providing a corroborating
circumstance…"), the court cited cases where the statements were made to fellow
inmates and held that "the mere fact that the recipient of the information was a
confidante of the declarant does not rule out admissibility of a statement as
against interest." *Id.*

In *Dargan*, the defendant objected to the introduction of statements from a
cellmate of a co-defendant. 738 F.3d at 649. The cellmate testified that the co-
defendant admitted that he and two other co-conspirators (which the government
alleged included the defendant) robbed a jewelry store. *Id.* at 646. This was the
crime for which the defendant was charged. *Id.* The court upheld the admission of
the statements. *Id.* at 650. The court concluded:

> Here, both the context and content of the challenged statements indicate
> their self-inculpatory quality. First, Harvey made the statements to a
> cellmate rather than, for instance, a police investigator. He thus had no
> obvious motive to 'shift blame or curry favor.' *United States v. Jordan*, 509
> F.3d 191, 203 (4th Cir.2007) (internal quotation marks omitted). Second,
> the statements are intrinsically inculpatory to the extent they demonstrate

Harvey's knowledge of 'significant details about the crime,' *Williamson*, 512 U.S. at 603, 114 S.Ct. 2431, and 'implicate him in a conspiracy,' *United States v. Udeozor*, 515 F.3d 260, 267 (4th Cir.2008). *Id*. at 649.

The court went on to rule that the statements were sufficiently corroborated, citing several relevant factors for this inquiry.[3] *Id*. at 650.

In any case, federal courts have most frequently admitted statements against interest through a third party when 1) the statement from the declarant does not seek to curry favor from law enforcement and 2) it does not shift blame. 2 McCormick On Evidence § 319 (8th ed.) (see listed cases at footnote 14.). This includes statements that show the declarant's insider knowledge of a conspiracy. See *Id*. As in this case, statements that are made to a private individual, even if in custody, are unlikely to curry favor. *Id*. at footnote 19; *US Infrastructure*, at 1209. As such, even if the court finds the statements outlined above are not admissible as statements of a co-conspirator, they qualify as statements against interest and do not violate the Confrontation Clause.

### C. Admissions and Adoptive Admissions

To the extent the Court finds certain out-of-court statements are not

---

[3] As the court in *Dargan* notes, among other factors, courts look at the relationship between the declarant and the witness and the nature and strength of independent evidence corroborating the statements. *See* 2 McCormick On Evidence § 319 (8th ed.) (listing cases at footnotes 30-38). The relationships between the defendants (who are the declarants) and the Government's witnesses, as well as the independent evidence, will corroborate these statements at trial.

admissible as coconspirator statements in furtherance of the conspiracy or statements against penal interest, independent bases still exist for admitting these statements. Statements of a defendant offered for the truth of the matter are admissible as statements of a party opponent. Fed. R. Evid. 801(d)(2)(A). Certain statements may also be introduced as adopted admissions as to the co-defendant. Fed. R. Evid. 801(d)(2)(B).

A statement offered as an adopted admission must meet two criteria. The "primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond." *See United States v. Carter*, 760 F.2d 1568, 1580 (11th Cir. 1985) (internal citations omitted). Second, there must be "sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Id.*

In the current case, some of the conversations the United States may introduce meet both criteria. The conversations that FEY made to PW4 were made in the presence of GUNTER, and PW4 will testify that GUNTER agreed with and acquiesced to the admissions of FEY. These statements concern admissions made by FEY that drugs provided by FEY and GUNTER resulted in the overdose death of a female. It is the government's position that these statements tend to prove FEY and GUNTER were responsible for causing the

death of K.B., and that they are admissible before both juries.

There may be additional out-of-court statements made by one of the defendants that should be admitted against both defendants under this basis.

## D. K.B.'s Statements are Admissible Pursuant to Fed. R. Evid. 804(b)(6)

At trial, the Government intends to introduce into evidence oral statements made by the decedent, K.B., to various different persons, including the defendants, the witnesses, and investigating law enforcement officers, among others. These statements concerned a variety of topics, including but not limited to the decedent's knowledge of the defendants' drug dealing activities at issue in this trial, the decedent's concern for her legal situation following her arrest, and the decedent's mistaken belief that FEY would not retaliate against her. All of the decedent's statements – no matter to whom addressed, and regardless of subject matter – are admissible pursuant to Fed. R. Evid. 804(b)(6).

The Supreme Court in *Davis v. Washington*, 547 U.S. 813, 833, 126 S. Ct. 2266, 2280 (2006), explained that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." The Federal Rules of Evidence codified the forfeiture doctrine in Rule 804(b)(6) which permits the admission at trial of hearsay statements of an unavailable witness if the statements are "offered against a party that wrongfully caused -- or acquiesced in wrongfully causing -- the declarant's unavailability as a witness, and did so

intending that result." *See also, Giles v. California*, 554 U.S. 353, 367-68 (2008). The party seeking to admit the evidence must prove by a preponderance of the evidence that the party against whom the statement is offered caused the declarant's unavailability by a preponderance of the evidence. *See United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001) (abrogating *United States v. Thevis*, 665 F.2d 616, 631 (5th Cir. 1982), which had required this predicate fact to be proven by clear and convincing evidence). The evidence's proponent must also establish that "the defendant ha[d] in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367.

In *Hodges v. Atty. Gen., State of Fla.*, 506 F.3d 1337, 1345 (11th Cir. 2007), the Eleventh Circuit pointed out that "[t]here is no more thorough way to obtain the absence of a witness than by murdering her, and no more deserving circumstance for application of the rule of forfeiture by wrongdoing." Nor does the Confrontation Clause bar the admission of statements pursuant to Rule 804(b)(6), for essentially the same reason that the statements are admissible. *See United States v. Stewart*, 485 F.3d 666, 670 (2d Cir. 2007) (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)) (noting that "the rule of forfeiture (which we accept) extinguishes confrontation claims on essentially equitable grounds").

It does not matter whether the decedent was ever scheduled to testify or expected to testify at an official proceeding. Rule 804(b)(6) is subject to no such

limitation. *See United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir. 2001) (noting that the common-law waiver-by misconduct rule, which was codified by the promulgation of Rule 804(b)(6), permits the introduction of a declarant's statements in "situations where there was no ongoing proceeding in which the declarant was scheduled to testify") (*quoting United States v. Miller*, 116 F.3d 641, 668 (2d Cir. 1997)) (internal alteration omitted); *United States v. Houlihan*, 92 F.3d 1271, 1279 (1 st Cir. 1996) (observing, in a case shortly predating the adoption of Rule 804(b)(6), that "we can discern no principled reason why the waiver-by-misconduct doctrine should not apply with equal force if a defendant intentionally silences a ***potential*** witness") (emphasis in original).

In this case, the standard is clearly satisfied for the admission of K.B.'s statements. The evidence of defendants' commission of the murder includes, by way of brief, non-exhaustive summary: direct eyewitness testimony of PW9 who witnessed FEY and GUNTER murder the decedent and conceal the murder; the defendants' repeated statements to various witnesses that they killed the decedent by giving her a "hot shot"; the admission by both defendants to government officials of being present with the victim on the night of the murder.

This evidence establishes well beyond a preponderance of the evidence that defendants murdered K.B. and provided the narcotics that caused her death, and thereby caused her unavailability as a witness at trial. K.B.'s statements are thus

admissible against defendants pursuant to Rule 804(b)(6).

Without allowing her hearsay testimony to be admitted, there is no basis upon which to prove that FEY and GUNTER committed the offense charged in Count One of the Superseding Indictment. K.B. conducted that controlled buy from the defendants in order to shed light on their criminal conduct and cooperate with the government. FEY and GUNTER, by their own admissions in recorded conversations, became aware of her cooperation against them. Rule 804(b)(6) was enacted for precisely the reason here; to prevent a defendant from deriving benefits from murdering the witnesses against him or her. The government submits that K.B.'s statements to Det. Tucker before and after the controlled buy on January 19, 2016, are admissible. The video recording that K.B. obtained is likewise admissible, because K.B. would be able to authenticate what was captured on that video had FEY and GUNTER not murdered her.

### E.   Authentication of Voices in Recorded Calls and Video

There are a number of recorded audio and video files of FEY, GUNTER, and others, discussing the case, concealing evidence of the conspiracy, and their continuation of distributing controlled substances. The participants of a conversation may be established through a variety of means, including self-identification, identification through nicknames, surveillance, and monitoring agents' use of known voice samples of the participants. *See United States v. Green*,

40 F.3d 1167, 1173 (11th Cir. 1994).

Rule 901 of the Federal Rules of Evidence provides in pertinent part:

> **(b)(5) Voice identification.** Identification of a voice, whether heard firsthand **or** through mechanical or electronic transmission or recording, by opinion based upon <u>hearing the voice at any time</u> under circumstances connecting it with the alleged speaker.

A witness to a conversation may offer his or her opinion regarding what the people engaged in the conversation intended. *See United States v. Awan*, 966 F.2d 1415, 1430 (11th Cir. 1992). When a witness' testimony is based upon his/her perception of conversations, the accuracy of those questions is a question for the jury. *United States v. Rivera*, 780 F.3d 1084, 1094 (11th Cir. 2015) (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)). Moreover, a witness may clarify conversations punctuated with ambiguous references to events that are clear only to the listener(s) of the conversation. *Rivera*, 780 F.3d at 1094 (citing *Awan*, 966 F.2d 1430).

### F. Hostile Witnesses

Although not anticipated to occur, the government will request permission to use leading questions during its direct examination with any hostile witnesses.

Rule 611(c) of the Federal Rules of Evidence provides as follows:

> **(a)** **Leading questions.** Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading

> questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a <u>witness identified with an adverse party</u>, interrogation may be made by leading question.

Under the aforesaid rule, a "witness identified with an adverse party" is considered a hostile witness as a matter of law, and is subject to direct examination by leading questions without any showing of hostility in fact. <u>See Notes of Committee on the Judiciary</u>, Senate Report No. 93-1277: Note 2, Subdivision (c). Subdivision (c) of Rule 611 significantly enlarged the class of witnesses presumed hostile and subject to direct examination through leading questions without a showing of actual hostility. <u>Haney v. Mizell Memorial Hospital</u>, 744 F.2d 1467, 1477-78 (11th Cir. 1984). A close friend of a defendant has been held to be a witness identified with an adverse party within the meaning of Rule 611(c). <u>United States v. Hicks</u>, 748 F.2d 854, 859 (4th Cir. 1984); <u>see also</u>, <u>United States v. Brown</u>, 603 F.2d 1022 (1st Cir. 1979).

### G. 404(b) Evidence and Notice of Intent to Introduce

In this case, government witnesses will present testimony that the defendants engaged in acts of drug dealing or distribution before, during, and after the time period alleged in the Superseding Indictment. The government submits that such evidence relates to the formation of the conspiracy and is inexplicably intertwined with the charges set forth in the Superseding Indictment.

Evidence that the defendants routinely sold drugs is also admissible pursuant to Fed. R. Evid. 404(b).

Evidence of other crimes and acts is <u>not</u> admissible "to prove a person's character in order to show that . . . the person acted in accordance with the character." Fed. R. Evid. 404(b). Notwithstanding, evidence of other crimes and acts that are inextricably intertwined with the charged offense, however, is admissible to provide "context, motive, and set-up of the crime and is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. Geter*, No. 07-10727, 2008 WL 1777416 (11th Cir. April 21, 2008) (quoting *United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir. 1997)). "[E]vidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation and citation omitted).

Under Fed. R. Evid. 404(b), evidence of a crime, wrong, or other act can be admitted to prove, *inter alia*, motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, or lack of accident. When a defendant pleads not guilty, he has placed his intent directly in issue. *United States v. Matthews*, 431 F.3d

1296, 1311 (11th Cir. 2005). *Edouard* sets out a three-prong test to determine the admissibility of evidence under Rule 404(b):

> (1) it must be relevant to an issue other than defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy [Federal Rule of Evidence] 403.

485 F.3d at 1344.

Here, the defendants' motive, opportunity, intent, preparation, plan, and knowledge regarding their drug trafficking business and the methods by which they did so are material issues in this case, and are highly relevant and probative regarding the purposes, means, and methods of the charged offenses. Accordingly, testimony pertaining to the manner in which the defendants set-up the business including the method of obtaining methamphetamine and heroin, packaging the drugs, selling the drugs, as well as their efforts to conceal their illegal conduct from law enforcement, should be admitted at trial.

Additionally, the evidence of their drug distribution activities are highly relevant to explain the actions and perceptions of witnesses as well as explaining the conduct of defendants leading up to the crimes. Therefore, this evidence is inextricably intertwined. For example, witnesses will offer testimony that FEY and GUNTER were regularly selling and using drugs in the months leading up to the murder. This provides context to understand how FEY and GUNTER were

using the premises to sell drugs, why FEY had so many drug users in and around the premises, and the events leading up the decision to murder K.B. Witnesses will describe FEY passing out on April 5, 2016, from over use of methamphetamine and heroin. As a result, drug users present in the residence were able to steal drugs and money belonging to FEY and GUNTER. When they discovered the theft, FEY and GUNTER became angry and recruited multiple people to assist in hunting down the people who were in the house that day. After failing to locate the stolen drugs or money, FEY and GUNTER turned their frustrations and anger towards K.B., who was present at their residence to obtain drugs for personal use.

After the murder, FEY and GUNTER continued selling controlled substances and always had multiple firearms available to them inside the residence. They also bragged of killing K.B. as outlined above. This caused witnesses to continue to be fearful of revealing the truth to law enforcement. After FEY and GUNTER were both jailed in 2020, for continuing their criminal activities well after the murder, witnesses became willing to cooperate. The details surrounding the ongoing criminal activities of FEY and GUNTER is therefore inextricably intertwined with the presentation of this case and/or admissible under Fed. R. Evid. 404(b).

### H. Impeachment of Government Witnesses

It is well established that a criminal defendant's "right to cross-examine . . . [the witnesses against him] is not unlimited." *United States v. Alonso*, 740 F.2d 862, 874 (11th Cir. 1984). That right is constrained, in the first instance, by Fed. R. Evid. 608(b) and 609, both of which restrict the scope and evidence that may be employed to impeach a witness.

### 1. Truthfulness Through Specific Instances of Conduct

Rule 608(b) precludes the use of specific instances of conduct to attack a witness' character for truthfulness or untruthfulness unless, in the discretion of the Court, those instances of conduct are themselves probative of truthfulness or untruthfulness. Fed. R. Evid. 608(b); *see United States v. Devery*, 935 F. Supp. 393, 407 (S.D.N.Y. 1996) (case law interpreting the express purpose of Rule 608(b) makes clear that "not all prior bad acts are admissible to impeach a witness.") "The types of acts which satisfy this strict test are forgery, bribery, suppression of evidence, cheating, embezzlement, false pretenses, fraud, and perjury." *United States v. DeStefano*, 1995 WL 398763, *7 (N.D. Ill. June 29, 1995); *see also United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (prior acts which are the proper subject of cross-examination pursuant to Rule 608(b) are those "which involve an element of deceit, untruthfulness, or falsification"). Theft is not such a crime of dishonesty. *See United States v. Sellers*, 906 F.2d 597, 604 (11th Cir. 1990)

(holding that "[i]t is established in this Circuit . . . that crimes such as theft, robbery, or shoplifting do not involve 'dishonesty or false statement' within the meaning of Rule 609(a)(2)"). "[A]cts involving force, intimidation, or based on *malum prohibitum* do not and should be excluded." *DeStefano, supra*.

Even if the nature of the prior act does concern a witness' truthfulness under Rule 608(b), its probative value must not be outweighed by its unfairly prejudicial effect, as provided in Rule 403. *United States v. Novaton*, 271 F.3d 968, 1005 (11th Cir. 2001); *Devery*, 935 F. Supp. at 407; Fed. R. Evid. 403 Advisory Committee Notes (although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence). The goal of the rules on impeachment by evidence of character or conduct is to ensure that the probative value of the evidence is high, while limiting the prejudicial dangers inherent in its use. *See* J. Weinstein & M. Berger, *Weinstein's Evidence* at 608-11 (1996).

2. <u>Extrinsic Evidence Other Than Convictions – Inadmissible</u>

Rule 608(b) imposes another important restriction on the scope of cross-examination: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness ... may not be proved

by extrinsic evidence." Other than a criminal conviction as provided in Rule 609, Rule 608(b) expressly prohibits a party from attempting to introduce extrinsic evidence to prove specific instances of conduct relating to the witness' veracity. This aspect of Rule 608(b) "embod[ies] specific concerns that . . . evidence of prior acts will either unduly prejudice and overpersuade the jury, or waste time by sanctioning countless credibility mini-trials within the trial proper." *United States v. Smith*, 232 F.3d 236, 241 (D.C. Cir. 2000) (citations omitted). Accordingly, "'[i]f the witness denies the conduct, such acts may not be proved by extrinsic evidence and the questioning party must take the witness' answer.'" *United States v. Garza*, 172 Fed.Appx. 983, 2006 WL 826096, at *5 (11th Cir. 2006) (citation omitted); *see also United States v. Batiste*, 2007 WL 5303053, at *4 (S.D. Fla. Nov. 7, 2007) (citing *United States v. Edwards*, 549 F.2d 362, 367-68 (5th Cir. 1977) (Rule 608(b) precludes introduction of evidence through the testimony of one witness to prove specific instances of conduct of another witness for purposes of attacking witness' credibility); *United States v. Falcon*, 245 F.Supp.2d 1239, 1247 (S.D. Fla. 2003) (precluding, under Rule 608(b), forensic psychologist from testifying as to another witness' psychological motivations for the manner in which witness testified)).

3. <u>No Extrinsic Evidence for Collateral Matters</u>

"A matter is collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." *United States v. Marino*, 277 F.3d 11, 24 (1st Cir.2002). Extrinsic evidence should not be used to impeach a

witness on a collateral matter. *See, e.g., Head v. Halliburton Oilwell Cementing Co.,* 370 F.2d 545, 546 (5th Cir.1966) ("[T]he letter obviously should not have been admitted to impeach plaintiff, for it impeached him on a collateral matter."). Therefore, no extrinsic evidence should be permitted to impeach a witness on a collateral matter.

4. <u>Limitations on Use of Prior Convictions</u>

Rule 609 likewise restricts those instances in which evidence of a witness' former commission of a crime may be utilized to attack his or her credibility. Such evidence of a prior crime is subject to certain time limitations and, unless it involves dishonesty or false statement, must be both a felony and survive a Rule 403 balancing test.

Pursuant to Rule 609(a)(1), felony convictions not more than 10 years old are generally admissible for impeachment purposes. Misdemeanor convictions, also not more than ten years old, are admissible only if they "involved dishonesty or false statement." *Id*. Further, except under limited circumstances, juvenile adjudications are not admissible. *United States v. Williams*, 963 F.2d 1337 (10th Cir.1992). Cases where adjudication was withheld are also not convictions within meaning of rule. *United States v. Hamilton*, 48 F.3d 149 (5th Cir.1995).

Under Rule 609(a)(1), there is a presumption against using stale convictions to attack a witness's character for truthfulness. *United States v. Cathey*, 591 F.2d 268, 275 (5th Cir.1979). The proponent must show "exceptional circumstances justifying the use of an over-age prior conviction." *Id*. at 276.

Misdemeanor convictions are usable for impeachment purposes only if they "bear directly on the likelihood that the [witness] will testify truthfully." *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977). Such convictions must be in the nature of "'perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense * * *' [citation omitted]'" to be admissible for impeachment purposes. *Id.* at 827.

The government intends to confer with defense counsel prior to the calling of each witness to ascertain their proposed impeachment of that witness. If the parties disagree about the scope of impeachment, we will seek a ruling from the Court prior to the examination of the witness.

<div style="margin-left: 40%;">

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:   s/ *Michael P. Felicetta*
MICHAEL P. FELICETTA
Assistant United States Attorney
Florida Bar No. 94468
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone: (352) 547-3600
E-mail: michael.felicetta@usdoj.gov

s/ *Tyrie K. Boyer*
TYRIE K. BOYER
Assistant United States Attorney
Florida Bar No. 0124940
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone:   (352) 547-3600
Facsimile:   (352) 547-3623
E-mail:      tyrie.boyer@usdoj.gov

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Joseph Johnson
Daniel Hernandez

s/ *Michael P. Felicetta*
MICHAEL P. FELICETTA
Assistant United States Attorney
Florida Bar No. 94468
35 SE 1st Avenue, Suite 300
Ocala, Florida 34471
Telephone: (352) 547-3600
E-mail: michael.felicetta@usdoj.gov